Good morning, Your Honors. John Taylor from the law firm of Horvitz & Levy here for Leader Insurance Company. I'd like to reserve five minutes of time, but I'll try to keep my eye on the clock here to do that. The first issue I'd like to address this morning is why the judgment should be reversed for a new trial based on the submission of an erroneous liability theory to the jury. Here, the policy in question contains a typographical error in the definition of an uninsured motor vehicle. It defines — You know, I understand your problem, because you're stepping in as appellate counsel. Yes. But there is no evidence that it was a type-up. It may well have been, or it may well have not been. It went all the way through the Department of Insurance, and who knows how long this policy has been around. In any event, there is no evidence that it was. And the insurance company didn't try to get Reformation on the ground that it was a goof. So it seems to me that the policy says what the policy says. Well, let me address that, because I can see your concern on that issue. First of all, on the Reformation point, there was no notice, Leader, that this was going to be a theory of liability. In the opening statement, if you go back and look at what opposing counsel argued, he said nothing about this theory that he sprung on, Leader, at the end of the case, that this particular policy provision provided uninsured motorist coverage for accidents with insured motorists. In fact, he said the opposite, that this was an accident involving an uninsured motorist, and that Leader should have paid its policy limits because of that. So this was a theory that came out during the jury instructions. This idea of seeking Reformation. Kagan. I'm just curious about the language out in the evidence. There was quite a bit of discussion with Hennessey? Hensley. Hensley, about the language. It came up in the deposition where she was questioned about the flaw in the argument. It can't have been a surprise. She told her own lawyer that the language was horrendous. Well, actually, the evidence on that point is he said she said something. He wrote it down as horrendous. He doesn't remember the exact words that she said. That's in the evidence. Well, let me turn to the issue of the policy interpretation, which I think you've asked, is extrinsic evidence on whether this is a typographical error necessary under California law? First of all, I think the Court would agree that this is a question of de novo review for this Court to determine what this policy means, applying the California rules of statutory construction. Well, look, if you look at the policy, there's no ambiguity about it at all. I mean, it says what it says. Well, this is my point, that there is no ambiguity requiring extrinsic evidence because it's such an obvious typographical error within the context of the policy. California law specifically says even where language is clear, it cannot be applied if it creates an absurdity, and that's exactly what would happen here. If you don't ignore what's an obvious typo in that particular definition, you're giving uninsured motorist coverage for accidents with insured vehicles. No one's ever heard of a policy like that. It makes no sense. Second, you have to look at this. Kagan. The insurance companies are titled to be unsensible. Well, you have to look at this particular provision in light of the statutory scheme, because this language, this requirement that the policy have uninsured motorist coverage, it's mandated by California law under Section 11580.2, Insurance Code 11580.2. The statutory language is actually specified. It defines what an uninsured motor vehicle is. And this particular policy provision tracks that language exactly, but for one word. The A should have been no instead of A. Nor is it that it gives a greater degree of coverage. It doesn't, Your Honor, because the policy is required to have that language in there. If the insurance company intended to give a greater degree of coverage, they would have to have two definitions. They would have to have the one that tracks the statutory language, and then they'd have to have this separate provision that has this greater coverage that supposedly they wanted to give. But just, you know, I think there's a number of cases that says courts should not set aside their common sense in interpreting policies. And when you look at this, nobody, even the insured here, would expect to get uninsured motorist coverage for cases in which an accident is caused by an insured vehicle. I think there's a quote that appears in a lot of cases that says we cannot ignore as judges what we know as men and women. If this kind of language had appeared in a brief, Your Honors, you would understand that it was a typographical error, and not interpret it literally. Even Plaintiff's own expert here. Ginsburg. The problem is that you have or your client had a whole bunch of opportunities to clarify that. I mean, from day one, she could have said, here's our policy, given the policy to their lawyer, and said, you know, I don't know what this means, but obviously it's crazy. So we need to take some step to correct the impression that we might be insuring an insured accident. Could have taken some pretrial step, motion for summary judgment, motion to reformation, whatever. Could have requested an instruction. Could have requested a curative instruction after the argument was given. Could have objected to the line of questioning of Hensley. Could have done all of those things and didn't, and yet comes down to us and says, well, come on, we should be the ones to be sensible. Well, Your Honors, if you look at the claim's history, there was never an assertion during the entire handling of this claim by opposing counsel that she should get uninsured motorist coverage because this one driver, Fidgeyland, had insurance. That was not part of the claim's handling in this case. The opening statement at trial never cited that theory as a theory of liability, even though most of the closing argument was devoted to she said I should get my policy limits from the uninsured, which is 15,000, and the company leader is saying, well, no, we're going to get to deduct anything that you might get from Fidgeland, what's his name? Fidgeland, that's how I say it. I may be pronouncing it wrong. That's why they won't give her her uninsured motorist coverage, because they claim they get to deduct whatever Fidgeland's going to pay. And yet, if you look at the policy, they're not going to get to do that. Right. But they never articulated that because Fidgeland was an insured driver, you should pay the limits of your policy, because that's what the policy says as a literal matter. And it wasn't a theory in the opening statement. And there may have been some hanging of Hensley out to dry during the trial itself on all the mistakes she made during the handling of this policy and tweaking her about her policy language being bad. But there was never an assertion that this was going to be the theory of liability presented to the jury. And when it came up during the discussion of these jury instructions, counsel appropriately said, Your Honor, that's not a legitimate interpretation of this policy. You should interpret this as a matter of law and foreclose that argument. And the trial court said, no, I think that's a perfectly appropriate argument that should go to the jury. And again, counsel objected during the argument itself and again was overruled. The idea of submitting an instruction, I think, is really a red herring, because there really wasn't an instruction to submit. If the jury had not been told about this erroneous policy interpretation, there was no need to counteract that with an instruction. And that's what our counsel asked for. Please don't let this argument be asserted to the jury. It's erroneous. And it would at the point where the judge said, no, I think it's appropriate, trying to instruct or obtain an instruction to the contrary would have been a futile act. And the case is even cited in our opponent's briefs as where it would be futile to request a jury instruction, it's not. It's not futile, except that the judge might very well have said, well, the contract says what it says, or the policy says what it plainly says. The judge acknowledged that, obviously, this judge particularly knows that it's up to the court to construe contracts, but you never ask otherwise. He said it right then. He said, that's not the issue. The issue is, you know, the issue is bad faith. And why aren't they entitled to argue that concealing the policy, a language that was horrendous, was an indication of bad faith? Because if the language means something different than what counsel argued, as a matter of law, the interpretation of written contracts under California law is an issue for the court, not for the jury to decide. Juries aren't competent to interpret contracts, especially one here. Kagan. Anybody can read this one. Well, anyone can read it. And that was what was so seditious about this, because, in fact, counsel argued to the jury, you don't need to be a lawyer to read this language and understand that this policy provides uninsured motorist coverage for accidents caused by insured drivers. Well, sure, that appeals to a jury, but as a matter of law, if you apply the rules of contract interpretation under California law, it's erroneous. And I've already talked about even plain language can't be applied if it results in an absurd result. There's another rule of statutory construction. You have to look at the entire policy, not just a particular language in isolation. And here, when you look at the policy, it's clear the party's intended to provide uninsured motorist coverage for accidents with uninsured vehicles. It says on the declarations page, in the heading where this portion of the policy applies, Osborne herself said when she was asked whether she wanted this coverage, she wanted it so she'd be protected if she was covered in an accident caused by an uninsured vehicle. Finally, there's the rule that policy provisions have, if there's an obvious mistake, it has to be ignored in order to apply the intent of the parties. And I think, you know, under California law, you are to not use extrinsic evidence if there's no ambiguity. And I think there really isn't an ambiguity here, that this was an obvious typographical mistake. For that reason, I think, Your Honors, that if I am able to persuade you that this contract interpretation was erroneous, that there was prejudice requiring a new trial under the general verdict rule, which we've talked about in our briefs. If you can't know which theory the jury based liability on, you have to reverse. And here, this was a very appealing theory to the jury. They were presented with a very complex factual situation, coverage issues, and in closing argument, Plaintiff's counsel came up with this very appealing argument, which was very simple. You know, you can look at this language, it says the opposite of what you'd expect in a policy. They should have given this uninsured motorist coverage for an accident with an insured vehicle. It's the kind of policy nobody's ever heard of and the leader didn't intend to give. But the jury could very easily and probably did say this is a theory on which we can base liability. In fact, during the punitive damages phase, opposing counsel said to the jury, I'm sure that's the basis for your finding of malice, oppression, and fraud. So I think we have here what's probability of prejudice under the general verdict rule, since you can't know what the jury based its verdict on. If this is an erroneous theory, it requires reversal. And also under the new case, this Court recently decided, oh, breathe, there's a presumption of prejudice, which I don't think can be rebutted here, where counsel has affirmed that he sought liability on this basis, that liability is proper on that basis, and even told the jury that he thought that was the basis for their decision. I'll move on to the punitive damages argument we've made. I would just like to address that briefly. I really – this is not a punitive damages case. It's a situation where there was a non-California company based in Alabama, which was faced with law, didn't fully understand it, retained a California specialist, an outside counsel, to give it advice. That advice turned out to be wrong. We don't contend that it was right. They followed that advice to their detriment, and here they ended up. Those are mistakes that may have been negligent. There may have been a lot of things, but they don't amount to punitive damages here. And all the cases cited in our opponent's brief are pre-1987 cases involving punitive damages imposed against insurers. And it was in 1987 that California court law changed dramatically to add a new element. Sotomayor, help me on one thing here. You know, you have a very experienced district judge who tried the case, who obviously understood it, and the same pitch was made to him on punitive damages. And he rejected it, which has got to be somewhat – which has got to inform, at least, our – my view of the propriety of punitive damages, because he was fully apprised of State Farm. He tried to craft an instruction in light of State Farm with the party's consent, as he observed. And I'd just like to hear you out on that, because he went through all the State Farm guideposts. Well, let me make clear here, this part of my argument is not based on the due process analysis in State Farm. This is based on substantive limitations imposed by California's statute on punitive conduct, which, let me just quote, because I think it's important. Conduct so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down and despised by ordinary, decent people. I suppose that you can make a pitch. I mean, I'm no fan of punitive damages, but I think you could probably make a fairly good pitch that it was kind of miserable to avoid paying $15,000, which is basically not very much. And I think you could make a pretty good pitch that it was not very much, or offering policy limits, $15,000 to a woman that the company knew was an employee of Sears, making less than $20,000 a year, had ongoing head injuries. They had a policy. They didn't even show their own lawyer, and did no investigation and deliberately said, hey, you know what? We're not going to spend any money on this because it isn't worth it. Now, I mean, if you were a juror, you might say, you know, geez, that is just miserable treatment. You could do that, couldn't you? Well, I don't think under California law with this substantive change that happened in 1987 requiring despicable conduct. If you look, every element of the thing you talk about was in the instruction to the jury. Yes, I think it was. The jury was told you have to find it despicable. Yes, Your Honor. But on review, even where there's been juries who have found punitive damages, the courts of appeal in California have found that a negligent or slipshod investigation doesn't meet the despicable conduct element, that a legally erroneous position by an insurer, that's in the Tomaselli case, doesn't amount to a punitive damages case, even if it's bad faith, the mere refusal to delay or mere refusal to pay or delay in paying is not enough. In our opening brief at page 51, we cite those cases. In the Shade Foods case, I think it says that this conduct required for punitive damages is of a different dimension than that required to find bad faith. Now, all the things you've mentioned, Judge Reimer, go to the bad faith finding. And as far as our challenge to the punitive damages argument, we don't dispute that. I mean, assuming that the jury's verdict didn't rest on this erroneous theory that I've already mentioned for earlier, there simply is not a basis, a legal basis under California law, even saying the side of State Farm, for imposing punitive damages in this case, under the case law. And you'll notice in the brief there isn't a single post-1987 California case. They have cited none which upholds a punitive damages award simply based on what they say is the conscious disregard element without going on and also finding despicable conduct, which we say isn't met here. If there are any further questions, I'll reserve the remainder of my time for rebuttal. Ms. Fackler. May it please the Court. Jeff Fackler appearing on behalf of Plaintiff and Appellee Karen Osborne. I think since my colleague here first addressed the issue of the interpretation of the policy, I would also like to address that. First, with respect to the standard of review, this Court's standard of review, in a diversity case, the court of appeal defers to the district court on the interpretation of State law unless the district court's interpretation of State law. And I think that's something that we've been talking about for a long time, and I think that's something that we've been talking about for quite some time. It may be sensible, but I think the Supreme Court said that's not quite accurate. We don't need to go there, do we? Well, no, I don't think we do, because as the Court recognizes, as the Court recognizes that this is not an issue of insurance policy interpretation, first of all, because Leder, in this case, did not request any jury instructions, that the jury must interpret the policy in the way it now argues on appeal, that the policy should be interpreted. Now, Leder says this is not a jury instruction case, but if the Court looks at the record, when it was arguing against the interpretation it's now arguing for, what Leder's counsel said at that time, this is the Court's province, the Court's duty to instruct the jury. And this was in the middle of a discussion of jury instruction. So in essence, this is an issue of jury instruction. Leder never argued at the district court level that the Court should give jury instruction as it is now saying the policy should be interpreted. In fact, there was never an argument made at the trial court level that there was a typographical error or mistake, and clearly the evidence is to the contrary. They presented no evidence. Now, Leder knew as early as Leder's managing agent, Louise Hensley, and Leder does not dispute that. Ms. Hensley was a managing agent for purposes of the handling of this claim. She knew as of October 11, 1999, that's the date on which she reviewed the policy and told her attorney that the policy had horrendous language. So she knew as early as that time, and of course Leder knew having issued the policy, that this was what the language of the policy was. And Louise Hensley did not testify that there was a mistake. She, in fact, testified that she disregarded the language of the policy in the handling of the claim. So there's no evidence of a mistake. And clearly, the argument that there was no notice or that there was some sort of a surprise theory is belied by the fact that its managing agent and its witness knew that this was the policy language well in advance of the trial. There's no absurdity here either. The uninsured motorist coverage required by the California statute, 11-580.2, specifically states that the coverage must be included in the policy and must be offered to insurers purchasing automobile liability insurance in California. So that language is in the policy by operation of law, even if the policy says nothing about uninsured motorist coverage. The additional language, the additional offer of grant of coverage is perfectly consistent with that. It creates no absurdity because the insurance company can, of course, offer more coverage than is required by the statute. So in other words, there's no obvious mistake or there's no mistake whatsoever here and there was no evidence of a mistake. And again, this comes back to the issue of a jury instruction. Leaders saying that Ms. Osborne's counsel should have been precluded for making this argument, but counsel was making an argument that was based on the evidence before the jury. Not only was it the evidence before the jury, it was the undisputed evidence. Leaders stipulated, this is our policy, this is the language of the contract. What Osborne's counsel was doing was simply saying, this is the language of the contract. This is how it was applied and ignored in this case. And we also had testimony from Keith Charleston, who was plaintiff's and appellee's expert witness, testifying to the fact that it was in bad – it was an act of bad faith for the insurance company to disregard the language of the policy. The insurance company is the author of the policy. It's the one that submits the policy to the California Department of Insurance for review, and it's the one that issued the policy. It has to stand behind its promises. For it not to stand behind its promises is a breach of the implied covenant of good faith and fair dealing. Since the – I'd like to now turn to the punitive damages argument, and the only argument that's been made here is the fact that Leader is an Alabama insurance company. It relied on the advice of its counsel in the handling of the uninsured motorist claim here. And once again, the standard review here is if there is any evidence in the record contradicted or uncontradicted which supports the jury's determination that Leader acted with fraud, malice or oppression. So first the Court has to disregard Leader's brief, which simply purports to cite the record as a whole rather than addressing only the evidence which supports the verdict and disregarding any evidence which is contrary to the finding of the jury. In order to show reliance on the advice of counsel, Leader has to establish three things. First of all, that it relied on the advice of competent counsel. Second, that it fully disclosed all relevant facts to the attorney on whom it purportedly relied. The jury, right? This did go to the jury, yes. So the jury's verdict implicitly discounts that. Right. Yes. And Leader certainly argued in the court below that, you know, it was simply doing what it thought was best, that it relied on the advice of its counsel and so forth. But in fact, that did not happen in this case. There was no actual or reasonable reliance, which is the third prong of that. First of all, the attorney that Leader retained was not an expert on uninsured motorist coverage, had never in his entire practice advised an insurance company on the handling of a claim for U.M. benefits. He was a defense counsel, meaning he defended he was retained by insurance companies to defend insurers in lawsuits that were filed by insurers. He may have also defended U.M. cases as well, but he was not an expert on advising insurance companies as to their obligations under uninsured motorist policy, and in fact, he had not done so in his entire career. Secondly, and I think this is another important point, Leader cannot show that it fully disclosed all relevant facts to the attorney. First of all, there's the policy. I guess my only question is, I mean, the jury found that they didn't rely on the advice of counsel. I believe that was at least an implicit finding in the verdict. Well, I didn't interpret the facts in favor of the verdict. Right. By virtue of the fact that the the jury determined that the insurance company briefed the implied covenant of good faith in their dealing, and that at least includes an implicit finding that there was no reliance on the advice of counsel, or that reliance was not reasonable if, in fact, there was any reliance on the advice of counsel. The third issue that my colleague raised is that there was no evidence of U.M. Despicable conduct in this case. And this goes to the evidence of what the city goes to the issue of whether there was any evidence in the record contradicted or uncontradicted which would support the jury's finding that Leader acted with fraud, malice or oppression. Now, they cite the definition of despicable, or they cite a definition of despicable, which is the language which is used in the California punitive damages statute, Civil Code section 5294. And as counsel acknowledged, this the jury was specifically instructed that this was the standard that has to be met. There had to be, with respect to the issue of malice, there had to be despicable conduct in conscious disregard of a person's right and also with oppressions that despicable conduct occurred in derogation of the rights or contrary to the rights and or safety of another person, which is why our brief discusses in detail the numerous violations of Karen Osborn's rights under California law that were committed by Leader in the insurance and the handling of the claim. Counsel here cites the definition of despicable and emphasizes the fact that the conduct must be found despicable by ordinary, decent people. That, in this case, was the jury, the individuals, the men and women who heard all of the evidence, heard the testimony, heard Leader's explanation. The jury made no determinations and excuses for its conduct and nevertheless found that Leader had in fact engaged in despicable conduct with malice, fraud or oppression. And certainly as the standard review, the Court cannot substitute its view of the evidence for the evidence that the jury or the determination that the jury made. They argue, Leader argues that the conduct was merely negligent, slipshod or erroneous, but in fact it was much, much more than that as the jury found. We have Louise Hensley specifically disregarding the language of the insurance policy because she didn't like it. She conducted, she was the managing agent and therefore her acts are attributable to the company. She conducted no investigation and in fact told her attorney to conduct no investigation so they never found the facts that would have supported the payment of the policy limits. The expert witness, Mr. Kornblum, testified that the policy limits should have been paid at least by August when Louise Hensley first observed. All of the, I mean, at least the last two things go primarily to showing bad faith. And you know you've got to show something more than bad faith to justify the punitive damage liability. Absolutely. There must be something miserable beyond just being, acting in bad faith. Well, certainly conduct which constitutes bad faith can also constitute despicable conduct. Or there's got to be something more than that. And there was. The insurance company has an obligation under its policy, under its California law, to investigate a claim fully and thoroughly. Bad faith. Exactly. It's also, it also extends to despicable conduct because it's a conscious disregard. If that were true, there'd be punitive damages in every single insurance case. I mean, you've got to have something more than just the conduct that supports a jury verdict of bad faith. And we have that here. Just what? We have intentional misconduct. We have intentionally disregarding the language of the insurance contract so as not to pay the policy benefits that are owed at the time that they should have been paid. We have Leder attempting to condition the payment of the policy limits even after the jury's verdict in the underlying case on Karen Osborne's release of her rights under California law to obtain compensation for the misconduct of Leder. We have Leder not paying those policy limits until a more than a year. I would suppose that your best argument is the one that I've already mentioned, which is that Leder knew when it did this that this was a woman who only was making $20,000 a year, who had a child to support, and you had ongoing serious head injuries. Now, that sounds miserable. It doesn't sound miserable to me that they just preferred their own interests over somebody else's, because that happens every day. I mean, that's why we've got hundreds of bad faith insurance cases. Yes. And that does go to the reprehensibility factors of State Farm. They deliberately ignored the fact that this was an individual, the sole support of, at the time of the accident, a 2-1⁄2-year-old young son who had no health insurance, could not pay her medical benefits. Leder was the person that she looked to, that she contracted with, so that in the event of an auto accident, she would have money to pay her medical expenses. From the time of the accident through May of 1999, six or seven months later, she had incurred almost $8,000, which was half of her yearly salary in medical expenses, and she couldn't pay those. Now, Leder did nothing, even though it knew she had incurred the expenses. It didn't investigate. It did nothing to determine whether or not she could pay those. Leder, by not paying the policy benefits, basically forced her into a situation where she was hounded by her creditors. She couldn't pay the bills. She had to do – a judgment was entered against her, and she was subject to garnishment of 25 percent of her wages. That's a fully a fourth of her annual – of her bi-month – bi-weekly paycheck, where she couldn't afford – she couldn't afford to feed and clothe her son. She couldn't afford to have daycare for her son. She had to borrow money. She was at risk of becoming homeless. And Leder, in this case, acted with no concern whatsoever for the consequences of its refusal to pay the policy benefits, the consequences of that to Karen Osborne. And the reason it did was to save money. It's only concern. This is not a case where it favored its own interests above the interests of Karen Osborne. This is a case where they disregarded Karen Osborne's interests completely, even though she had paid premiums to get this coverage, so she would have – be able to pay her medical expenses, lost wages, when she was in an accident. They disregarded that completely. They told their attorney, do nothing, do no investigation, do no legal research. They concealed the policy language, which obligated them to make the payments to Karen Osborne from the attorney. So we've got a situation here where clearly there was much more than simply a refusal to pay policy benefits. This isn't a situation – this isn't a case between a large commercial entity and an insurance company with – both with considerable resources, both able to – both able to retain attorneys and fight for themselves. This is a case where a very vulnerable woman suffered serious injuries and couldn't get the insurance coverage that she paid for. I'd also like to briefly address the issue of the jury inspection. I think you've put your finger on, maybe in a more concise way, what I wanted to argue, which is there must be a jury inspection to determine whether or not there was a misdemeanor     And I've heard a lot about this woman's particular circumstances and what she suffered. And that's not disputed as far as the facts, but what is disputed is did Leder know anything about any of that? Leder, your – Hensley said that she knew – she may not have known what Mr. Fackler was now just spinning out about bankruptcy and the creditor or whatever, but she admitted that she knew, that she worked for Sears making less than $20,000 a year, the child had ongoing head injuries, and they knew that the amount of the injuries was approaching policy limits. They did not know, though, that she did not have medical coverage for any of these harms. They did not know that she was not getting the medical care that she needed because she didn't have this money. The thing that prevented this money from being paid, even if it's an – even if Leder had correctly analyzed this as an uninsured rather than an uninsured motorist claim, the thing that prevented that immediate payment from being made was opposing counsel who filed a motion to consolidate the arbitration and the trial on the merits in this case. Normally, in an uninsured motorist case, you have a quick arbitration to decide what's the liability of the different parties and the money gets paid. Here, Leder couldn't make that determination in an arbitration because counsel moved to consolidate with the trial on the merits. And so until that trial was held, Leder didn't know whether Martinez, the uninsured driver, would have any liability in this situation. And so it wasn't until then that Leder could pay the money. Simply because she was poor, those are all sympathetic circumstances, but you can't pay insurance claims based simply on that. Every insurance claim would be paid if it involved a poor person. I think you asked, was there a specific finding rejecting the advice of counsel defense? No. This is a general verdict. So we don't know what the jury based liability on. And as I mentioned earlier, it could have been based on the instruction given that if you act on the advice of counsel as a defense. Right. But this other theory, this theory about the erroneous policy language, that was not part of the advice of defense defense, advice of counsel defense. So if the jury based its verdict on that, it could have ignored this whole sideshow about whether there was advice of counsel or not. So if that theory is erroneous, as I've said earlier, it taints the entire verdict. And I think there's a clear case where opposing counsel had a good case, overreached by injecting into the case a theory that tainted the entire verdict. Basically, his own expert, Guy Kornblum, the name came up in opposing counsel's argument, when confronted on the jury stand, said, well, I can't really interpret the policy language the way you want me to, which is that it provides uninsured motorist coverage for an accident with an insured vehicle. That's just not a reasonable interpretation. That's not the exact language he used, but that's what it says. But under any reasonable interpretation of that language, it does not, cannot be interpreted that way. Thank you very much. I'll submit on that. Okay, I think it's time to look at the regarding the matter we started with, that we submitted. We'll stand in recess for the day. Thank you. I'll use things up. No. Did you hear that? Oh, it's all right. The court is dismissed. Please stand. Thank you. Good luck. Thank you. Thank you.
judges: Noonan, Thompson, Rymer